IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KHALIFAH E.D. SAIF'ULLAH,

        Petitioner,             No. CIV S-02-2664 MCE DAD P

    vs.

TOM CAREY, et. al.,             <u>ORDER AND</u>

        Respondents.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with this habeas corpus action. Petitioner is in custody pursuant to a 1980 Los Angeles County conviction for kidnaping. He has served approximately twenty-five years on his sentence of seven years to life in state prison. In the petition for writ of habeas corpus filed in this action on December 12, 2002, petitioner attacks a decision of the California Board of Prison Terms rendered on July 12, 2000, finding him not suitable for parole. Respondents filed their answer to the petition on April 7, 2003, and petitioner filed a traverse on April 15, 2003. Pursuant to the court's order filed May 15, 2003, respondents filed a supplemental answer on June 10, 2003, and petitioner filed a supplemental traverse on June 17, 2003.

        For the reasons set forth below, the undersigned will recommend that petitioner's application for a writ of habeas corpus be granted.

1

PROCEDURAL HISTORY

On July 12, 2000, the Board of Prison Terms held petitioner's eighth subsequent parole consideration hearing and again found petitioner not suitable for parole.  (Pet. at 5.) Petitioner appealed the denial of a parole date in an administrative appeal dated August 22, 2000. (Supplemental Traverse, Ex. A.)  The California Department of Corrections received the appeal on August 28, 2000, and the Board of Prison Terms Office of Policy and Appeals received it on September 6, 2000.  (Id.)

Petitioner did not receive a response to the appeal within 120 days after August 22, 2000, and therefore filed a petition for writ of habeas corpus, case No. FCR 188305, in the Solano County Superior Court on January 4, 2001.  (Supplemental Traverse at 2 & Ex. B.)  In a decision dated February 9, 2001, that court denied the petition without prejudice for failure to exhaust available administrative remedies prior to seeking judicial relief.  (Id., Ex. C.)

On January 9, 2001, five days after petitioner's first state habeas petition was filed, the Office of Policy and Appeals issued a decision denying petitioner's appeal on its merits. (Id., Ex. D.)  Petitioner then filed a second habeas petition, case No. FCR 190271, in the Solano County Superior Court.  (Id. at 2 & Ex. E.)  The court denied the petition on its merits in a written decision dated May 4, 2001.  (Id.)

On May 18, 2001, petitioner filed a habeas petition in the California Court of Appeal for the Third Appellate District.  (Id., Ex. F.)  On June 7, 2001, the petition was denied without prejudice to the filing of a petition in the First Appellate District.  (Id., Ex. G.)  Petitioner filed a petition in the First Appellate District on June 20, 2001.  (Id., Ex. H.)  The petition was summarily denied on July 10, 2001, and the appellate court subsequently advised petitioner that it lacked jurisdiction to rule on the motion for judicial notice it received from petitioner on July 11, 2001.  (Id., Ex. I.)  A habeas petition filed in the California Supreme Court was summarily denied on November 20, 2002, exhausting petitioner's state court remedies.  (Pet., unlettered exhibit following Ex. I.)  Petitioner filed his federal habeas petition on December 12, 2002.

PETITIONER'S GROUNDS FOR RELIEF

Petitioner seeks relief from this court on the following grounds:

Ground one:  The California Board of Prison Terms are religiously persecuting petitioner and holding him as a political prisoner from denying parole to him based upon petitioner adhering to the mandates of the Holy Qur'an from growing his mandated beard in violation of the First and Fourteenth Amendment to the state and federal constitution.

Ground two:  Petitioners' [sic] constitutional rights are being violated by the California BPT from its use of illegal "policies," "practices" and "regulations" used against petitioner which have not been approved by the Office of Administrative Law and are therefore "underground regulations" which are unenforceable in violation of the Fifth, Sixth, Eight[h] and Fourteenth Amendments to the state and federal constitution.

Ground three:  Petitioner contends that he is being denied due process and equal protection of the law from being denied a fair and impartial body of Board of Prison Terms members according to the mandate of California Penal Code Section 5075.

(Pet. at 5 & 41.)

In support of his claims, petitioner has provided copies of the transcript of his July 12, 2000 parole hearing (Exhibit A); a memorandum and exhibits submitted to the Board prior to the hearing (Exhibit B); an excerpt from Al-Muwatta of Imam Malik ibn Anas, The First Formulation of Islamic Law (Exhibit C); the determination of the California Office of Administrative Law on November 30, 1999, that "general policies or regulations, if they exist, allegedly used by the Board of Prison Terms to deny parole to life inmates are 'regulations' which are invalid because they should have been, but were not, adopted pursuant to the Administrative Procedure Act" (Exhibit D, Part 1); the determination of the California Office of Administrative Law on December 9, 1998, that, if the Board has a policy that results in the rescission of parole dates for all life prisoners granted parole dates under the Indeterminate Sentence Law, the policy constitutes an underground regulation that is without legal effect (Exhibit D, Part 2); the Board's matrix for the crime of kidnaping for robbery or ransom (Exhibit E); articles and legislative analysis concerning the parole policies of former governors Davis and

3

1   Wilson (Exhibit F); an excerpt from a deposition taken March 7, 2001, of a former member of

2   the Board of Prison Terms (Exhibit G); a document titled "Evidence Concerning Illegal Actions

3   of the California Board of Prison Terms, an Independent Study," dated May 20, 2000 (Exhibit

4   H); and records concerning petitioner's sentencing (Exhibit I).  Petitioner's Exhibits A through I

5   are followed by copies of documents demonstrating exhaustion of state administrative and

6   judicial remedies.

7          On January 21, 2003, petitioner submitted a copy of a document dated January 13,

8   2002, and titled "Brief of Amici Curiae in Support of Petitioner Khalifah E.D. Saif'ullah."  It

9   appears that the brief was submitted to the California Supreme Court on September 23, 2002, in

10  support of petitioner's final state habeas petition.

11                          RESPONDENTS' ANSWER

12         Respondents state that petitioner was sentenced to an indeterminate state prison

13  term of seven years to life for his conviction of multiple crimes, including kidnap for ransom

14  with use of a firearm.  Respondents advise the court that a subsequent parole suitability hearing

15  was conducted on November 14, 2002, and that petitioner was again denied parole.  Respondents

16  offer a copy of the transcript of the 2002 hearing and assert that the transcript is relevant to this

17  case because it contains admissions by petitioner and because petitioner received an additional

18  prison disciplinary action prior to his hearing in 2002.[1]  Respondents concede that petitioner

19  exhausted administrative remedies with respect to the claims raised in this action.

20         Respondents deny that petitioner has been subjected to religious discrimination in

21  violation of the First Amendment and further deny that the denial of parole in 2000 lacked an

22  evidentiary basis and violated the Fourteenth Amendment.  Respondents contend that the record

23  shows that petitioner's federally protected rights were not violated, that the Board found

24

25         [1]  Despite their assertion that petitioner's 2002 parole hearing is relevant to this case,
    respondents  have neither described the alleged admissions nor cited any pages of the transcript of
26  that hearing.

1  petitioner's religion a very positive influence on his life, and that there was more than "some

2  evidence" to support denial of parole.  Citing recent Ninth Circuit authority, respondents concede

3  that petitioner has a protected liberty interest in a determination of parole eligibility but argue

4  that a denial of parole should not be set aside on constitutional grounds so long as the denial is

5  supported by some evidence bearing indicia of reliability.  Respondents contend that, in applying

6  the "some evidence" standard, the court must not weigh the evidence or second-guess the state's

7  findings but must limit itself to examining the record and granting relief only when prison

8  officials act with no evidence whatsoever to support their decision.

9        Respondents contend that petitioner's claim that he was denied parole as a result

10  of religious discrimination should be summarily dismissed because petitioner has offered no

11  evidence in support of his conclusory allegation and because the record clearly indicates that

12  petitioner's religion was considered a positive factor in his life and none of the panel members

13  had anything but praise for petitioner's religious pursuits.  Respondents argue that petitioner's

14  contention that the Board violated state law by adopting, in effect, a no-parole policy is not

15  germane to a federal habeas petition, but, if it were, the contention was rejected by the California

16  Supreme Court in In re Rosenkrantz.

17        Respondents assert that state regulations require the Board to consider all relevant,

18  reliable information related to parole suitability, including the circumstances of the prisoner's

19  social history, past and present mental state, past criminal history, involvement in other criminal

20  misconduct that is reliably documented, the base and other commitment offenses, behavior

21  before, during and after the crime, past and present attitude toward the crime, any conditions of

22  treatment or control, including the use of special conditions under which the prisoner may safely

23  be released to the community, and any other information that bears on the prisoner's suitability

24  for release.  Cal. Code Regs., tit. 15, § 2402(b).  Respondents note that the regulations set forth

25  circumstances favoring and disfavoring suitability but provide that the importance attached to

26  any circumstance or any combination of circumstances in a particular case is left to the judgment

1  of the panel.  Id. at § 2402(c) and (d).  Respondents state that, while the regulations require the
2  Board to consider all circumstances, they do not require the Board to give equal attention to each
3  circumstance during its review or to give equal weight to each circumstance during its analysis.
4  Id.  Respondents assert that the regulations further provide that circumstances which taken alone
5  may not firmly establish unsuitability for parole may nevertheless contribute to a pattern that
6  results in a finding of unsuitability.  Id. at § 2402(b).

7         Applying the applicable regulations to the present case, respondents contend that
8  the Board considered all of the suitability circumstances and all relevant, reliable information, as
9  required, and that petitioner has not alleged otherwise.  Respondents' view is that petitioner
10 merely disagrees with the Board's conclusions and disputes the relative weight the Board
11 attached to the circumstances considered.  Respondents argue that the record shows that the
12 Board gave individualized consideration to all factors and circumstances favoring and
13 disfavoring suitability and that the Board supported its findings with ample evidence, thereby
14 meeting the requirements of due process.  Respondents contend that the Board acted within its
15 discretion under § 2402(c)(1)(B) when it cited petitioner's commitment offense as one factor
16 tending to show unsuitability for parole, because there were multiple additional factors
17 supporting denial of parole:  petitioner's own admission to a long and violent criminal record
18 prior to his commitment offense, petitioner's violation of numerous previous grants of parole, the
19 fact that petitioner committed the kidnaping while on parole for other offenses, petitioner's
20 accumulation of disciplinary infractions while in prison, the fact that petitioner's committing
21 offense was callous, i.e., kidnaping a young man at gun point and holding him for ransom, and
22 the fact that petitioner did not disclose the identity of his accomplice until recently after the
23 alleged accomplice died.  (Answer at 7, citing Ex. B at 9-11, 25, 28.)

24        Respondents concede that there are many positive aspects of petitioner's conduct
25 in prison, including his apparently sincere religious conversion, but argue that it is for the Board
26 /////

1  of Prison Terms to determine at what point the positive factors outweigh the documented

2  negative factors.

3                                   PETITIONER'S TRAVERSE

4          Petitioner disputes virtually all of respondents' contentions.  While he admits that

5  all of the panel members praised his religious pursuits, he argues that each panel member

6  specifically relied on the grooming standards disciplinary violation to deny parole.  Petitioner

7  asserts that respondents failed to address all of his contentions and should be deemed to have

8  conceded all issues not addressed.  Petitioner agrees with respondents' assertion that the

9  subsequent parole hearing held in 2002 contains relevant facts.  (Traverse at 1-2.)

10         Petitioner reiterates his view that his positive conduct in prison outweighed any

11  negative factors.  He asserts that, although the Board appeared to give individualized

12  consideration to the positive factors of his conduct, the panel members did not give those factors

13  adequate consideration because, had they done so, they would have found that the positive

14  factors outweighed the one disciplinary report petitioner received for following the commands of

15  his religion.  Petitioner dismisses the facts concerning his crime and his past history as facts that

16  will never change and that cannot be used as the sole basis for denying parole.

17         Petitioner acknowledges that his 2002 parole denial is "a separate cause of action"

18  but suggests that respondents have "opened the door" to new claims in this action.  Petitioner

19  offers extensive argument concerning his 2002 parole denial, the new disciplinary conviction that

20  was considered at the November 14, 2002 hearing, and various civil rights actions filed by

21  petitioner against members of the Board of Prison Terms.  (See id. at 3-14.)

22         Petitioner denies that the California Supreme Court approved of a no-parole

23  policy in Rosenkrantz.  He discusses no-parole policies at length and argues that respondents'

24  failure to address the issues presented in his amicus brief requires this court to deem those issues

25  to have been conceded and to find that petitioner has been deprived of his rights.  Petitioner asks

26  the court to order his immediate release.  (Id. at 14-29.)

                                             7

FURTHER PLEADINGS AND OTHER FILINGS

On May 15, 2003, the undersigned found that the record was unclear with regard to the state courts' adjudication of petitioner's federal claims. The record before the court at that time did not include copies of any state court decisions addressing the July 12, 2000 denial of parole. Respondents were directed to file a supplemental answer stating whether any reasoned state court judgment had been issued and, if so, to provide copies of all such judgments.

In a supplemental answer, respondents provided extensive information concerning petitioner's state court filings but found no reasoned state court judgment on the parole denial at issue. In a supplemental traverse, petitioner advised the court that respondents failed to provide information concerning the second habeas petition he filed in the Solano County Superior Court. Petitioner provided documentation of his administrative appeal and all state habeas petitions filed regarding the 2000 parole denial. The undersigned has relied on petitioner's documentation in setting forth the procedural history of the case. The record reflects that petitioner exhausted all claims alleged in his federal habeas petition and that the claims are not procedurally barred.

The court's file contains a series of requests for judicial notice filed by petitioner. In response to the first such request, the undersigned informed petitioner of the standards that govern judicial notice and denied the request in an order filed May 21, 2003. By order filed September 5, 2003, the court denied petitioner's second request for judicial notice. Three additional requests for judicial notice are before the court.

By a request filed on July 9, 2004, petitioner seeks judicial notice of two documents: (1) an order filed June 25, 2004, in a civil rights case, Mayweathers, et al. v. Sutton, et al., case No. CIV S-96-1582 LKK GGH P (E.D. Cal.), granting summary judgment and permanent injunctive relief for a class of Muslim prisoners seeking relief from prison disciplinary action taken against them for wearing beards for religious reasons, and (2) a letter dated June 18, 2004, to petitioner from an attorney. Petitioner asks the court to take notice of the Mayweathers order, set an evidentiary hearing, appoint counsel for him, and order his immediate release.

1    By a request filed January 11, 2005, petitioner seeks judicial notice of four

2 documents:  (1) an order for evidentiary hearing filed in Santa Clara County Superior Court on

3 November 18, 2004, in a habeas case brought by state prisoner Morris Bragg, (2) documents filed

4 by the respondents in the Bragg case, (3) an order filed June 6, 2002, relating petitioner's civil

5 rights case, Saif'ullah v. Terhune, et al., case No. CIV S-98-0570 WBS PAN P (E.D. Cal.), to the

6 Mayweathers class action; and (4) a class action notice issued pursuant to the Mayweathers order

7 previously offered by petitioner.  Petitioner asserts that the Mayweathers civil rights action is

8 "identical to the present case" and that he is a member of the Mayweathers class.  Petitioner also

9 asserts that the Bragg case concerns the same contentions raised in this case regarding

10 widespread abuse by the Board of Prison Terms and the Board's denial of parole based on a

11 prisoner's exercise of religious rights and the labeling of the prisoner's crime as exceptional.

12 Petitioner requests final judgment in his favor and release from confinement.

13    On March 1, 2005, petitioner filed a request for judicial notice that includes a

14 request to expedite this case.  Petitioner seeks judicial notice of (1) findings and

15 recommendations filed December 22, 2004, in Coleman v. Board of Prison Terms, et al., case

16 No. CIV S-96-0783 LKK PAN P (E.D. Cal.), a habeas case in which the magistrate judge found

17 that the prisoner "presents a convincing case that a blanket policy against parole for murderers

18 prevented him from obtaining a parole suitability determination made after a fair hearing" and

19 recommended that the petition for writ of habeas corpus be granted; (2) an order and findings and

20 recommendations filed on August 20, 2003, in Yellen v. Butler, case No. CIV S-01-2398 MCE

21 GGH P (E.D. Cal.), a habeas case in which the magistrate judge found that there was not

22 sufficient evidence to support the 1999 decision denying parole and recommended that the

23 habeas petition be granted on that ground and denied on all other grounds; and (3) the Bragg

24 order and documents previously offered by petitioner.

25    On June 6, 2005, petitioner filed a request for judicial notice of the entire record,

26 including transcripts and exhibits, in Coleman, case No. CIV S-96-0783 LKK PAN P.

1    Petitioner's pending requests for judicial notice of court documents will be

2 granted.  The requests for judicial notice of other documents will be denied.

3                                    ANALYSIS

4 I.  Standards of Review Applicable to § 2254 Actions

5    A writ of habeas corpus is available under 28 U.S.C. § 2254 "only on the basis of

6 some transgression of federal law binding on the state courts."  Middleton v. Cupp, 768 F.2d

7 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).  Federal habeas

8 relief is not available for errors in the interpretation or application of state law.  Estelle v.

9 McGuire, 502 U.S. 62, 67-68 (1991); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir.

10 1986).

11    Section 2254 as amended in 1996 sets forth the following standards of review to

12 be applied by federal courts to state court decisions:

13    An application for a writ of habeas corpus on behalf of a person
   in custody pursuant to the judgment of a State court shall not be
14    granted with respect to any claim that was adjudicated on the
   merits in State court proceedings unless the adjudication of the
15    claim–

16    (1)  resulted in a decision that was contrary to, or involved an
   unreasonable application of, clearly established Federal law, as
17    determined by the Supreme Court of the United States; or

18    (2)  resulted in a decision that was based on an unreasonable
   determination of the facts in light of the evidence presented in the
19    State court proceeding.

20 28 U.S.C. § 2254(d)(1) and (2).  See Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

21 Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

22 II.  The State Courts' Decisions

23    In the present case, both the California Supreme Court and the California Court of

24 Appeal for the First Appellate District summarily denied petitioner's state habeas petitions

25 challenging the Board's July 12, 2000 decision.  The order issued by each of these courts is "an

26 unexplained order," i.e., "an order whose text or accompanying opinion does not disclose the

1  reason for the judgment." <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802 (1991).  When confronted

2  with a state court's unexplained order, the federal court applies the following presumption:

3  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained

4  orders upholding that judgment or rejecting the same claim rest upon the same ground."  <u>Id.</u> at

5  803.  In applying the look-through presumption, unexplained orders are given no effect.  <u>Id.</u> at

6  804.  <u>See</u> <u>also</u> <u>Bains v. Cambra</u>, 204 F.3d 964, 970-71, 973-78 (9th Cir. 2000) (holding that

7  where the highest state court to reach the merits of a habeas petition issued a summary opinion

8  that does not explain the rationale of its decision, federal court review under § 2254(d) is of the

9  last explained state court opinion to reach the merits).

10        Here, the Solano County Superior Court issued an order that discloses reasons for

11  denying habeas relief.  This court will look through the unexplained orders of the California

12  Supreme Court and the California Court of Appeal to the decision of the Solano County Superior

13  Court in order to determine whether the state courts' adjudication of petitioner's federal claims

14  satisfies the standards set forth in § 2254.

15        The Solano County Superior Court explained the rationale of its decision to deny

16  habeas relief as follows:

17
>        The court finds that the decision of the Board of Prison
18  Terms panel at Petitioner's 7/12/00 Parole Consideration Hearing
>    was based upon "some evidence" other than the evidence of the
19  9/19/98 CDC 115 for violation of grooming standards.  See <u>In re</u>
>    <u>Rosenkrantz</u> (2000) 80 Cal.App.4th 409, 423-434, 95 Cal.Rptr.2d
20  279, citing <u>In re Powell</u> (1988) 45 Cal.3d 894, 902-904, 248
>    Cal.Rptr. 431.  Thus the court does not address the question of
21  whether the 9/19/98 CDC 115 was constitutionally valid.  The
>    court also finds that the Board of Prison Terms panel based its
22  decision upon the criteria of 15 CCR, section 2281, a regulation
>    which has been properly adopted pursuant to the Administrative
23  Procedures Act.  The court further finds that Petitioner has not
>    alleged facts sufficient to show that the Board of Prison Terms
24  panel denied him a fair hearing.  Thus, Petitioner has not stated a
>    prima facie case for relief as to any of the issues presented here.
25  See <u>In re Visciotti</u> (1997) 14 Cal.4th 325, 351, 58 Cal.Rptr.2d 801.
>    See also <u>People v. Duvall</u> (1995) 9 Cal.4th 464, 474, 37
>    Cal.Rptr.2d 259.

26  /////

11

1    IT IS THEREFORE ORDERED that the Petition for Writ
2    of Habeas Corpus is denied.

3    (Supplemental Traverse, Ex. E (Order of the Solano County Superior Court filed May 4, 2001).)

4    III.  Discussion

5    As set forth above, petitioner claims (1) the Board violated his rights under the

6    First and Fourteenth Amendments when it denied him a parole date due to his adherence to

7    religious mandates; (2) the Board violated his rights under the Fifth, Sixth, Eighth, and

8    Fourteenth Amendments when it applied policies, practices, and regulations not approved by the

9    state's Office of Administrative Law; and (3) his rights to due process and equal protection were

10   violated because he was denied a fair and impartial panel of Board members.  (Pet. at 5 & 41.)

11   A.  Petitioner's First and Third Grounds for Relief

12   The Due Process Clause of the Fourteenth Amendment prohibits state action that

13   deprives a person of life, liberty, or property without due process of law.  A person alleging due

14   process violations must first demonstrate that he or she was deprived of a liberty or property

15   interest protected by the Due Process Clause and then show that the procedures attendant upon

16   the deprivation were not constitutionally sufficient.  Kentucky Dep't of Corrections v.

17   Thompson, 490 U.S. 454, 459-60 (1989); McQuillion v. Duncan (McQuillion I), 306 F.3d 895,

18   900 (9th Cir. 2002).

19   In the parole context, a prisoner alleging due process claims must demonstrate the

20   existence of a protected liberty interest in parole and the denial of one or more of the procedural

21   protections that must be afforded when a prisoner has a liberty interest in parole.  The Supreme

22   Court held in 1979 and reiterated in 1987 that "a state's statutory scheme, if it uses mandatory

23   language, creates a presumption that parole release will be granted when or unless certain

24   designated findings are made, and thereby gives rise to a constitutional liberty interest."

25   McQuillion, 306 F.3d at 901 (citing Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7

26   (1979), and Board of Pardons v. Allen, 482 U.S. 369, 373 (1987)).  California's parole scheme

gives rise to a cognizable liberty interest in release on parole because Penal Code § 3041 uses mandatory language and is largely parallel to the Nebraska and Montana statutes addressed in Greenholtz and Allen. 306 F.3d at 901-02. "Section 3041 of the California Penal Code creates in every inmate a cognizable liberty interest in parole which is protected by the procedural safeguards of the Due Process Clause," and the interest arises, "not upon the grant of a parole date, but upon the incarceration of the inmate." Biggs v. Terhune, 334 F.3d 910, 914-15 (9th Cir. 2003).

Because parole-related decisions are not part of the criminal prosecution, the full panoply of rights due a defendant in criminal proceedings is not constitutionally mandated. Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). In general, due process is satisfied in the context of a hearing to set a parole date where the prisoner is provided with notice of the hearing, an opportunity to be heard, and, if parole is denied, a statement of the reasons for the denial. Id. (citing Greenholtz, 442 U.S. at 16). See also Morrissey v. Brewer, 408 U.S. 471, 481 (1972) (describing the procedural process due in cases involving parole issues). Violation of state mandated procedures constitute a federal due process violation only if the violation causes a fundamentally unfair result. Estelle v. McGuire, 502 U.S. 62, 65 (1991).

In California, the setting of a parole date for a state prisoner is conditioned on a finding of suitability for parole. Cal. Penal Code § 3041; Cal. Code Regs. tit. 15, §§ 2401 & 2402. If the state's decision regarding the parole suitability of a state prisoner is supported by "some evidence," the requirements of due process are satisfied. Biggs, 334 F.3d at 915; Jancsek, 833 F.2d 1389 (adopting the "some evidence" standard set forth by the Supreme Court in Superintendent v. Hill, 472 U.S. 445, 456 (1985)). To meet the "some evidence" standard, the evidence relied upon must bear indicia of reliability. Jancsek, 833 F.2d at 1390; Perveler v. Estelle, 974 F.2d 1132, 1134 (9th Cir. 1992) (per curiam). The some evidence" standard is minimally stringent and is met if there is any reliable evidence in the record that could support the conclusion reached. Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Superintendent

13

1   v. Hill, 472 U.S. 445, 455-56 (1985), and Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987));

2   Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986).  Determining whether the "some

3   evidence" standard was met does not require examination of the entire record, independent

4   assessment of the credibility of witnesses, or the weighing of evidence.  801 F.2d at 1105.

5           In the July 12, 2000 decision at issue, the Board stated that petitioner was not

6   suitable for parole because "he would pose an unreasonable risk of danger to society or a threat to

7   public safety if released from prison."  (Answer, Ex. B at 47.)  The presiding commissioner

8   stated the reasons for the panel's decision as follows:

9                   **PRESIDING COMMISSIONER ORTEGA:** . . . .  The
        number one reason, of course, was the commitment offense.  It was
10      carried out in a dispassionate and calculated manner.  It was carried
        out in a manner which demonstrates an exceptionally callous
11      disregard for human suffering.  These conclusions are drawn from
        the Statement of Facts wherein the prisoner and his crime partners
12      planned to kidnap the victim and to solicit 60 thousand dollars
        from his family and, as a result of that, the victim was kidnapped,
13      taken to the apartment, which belonged to the inmate.  He was held
        there overnight.  The next day, he was able to escape.  There was
14      an indication, Mr. Jackson, and I didn't get into it and I don't know
        if you want to make a comment to it, you can, if you don't want to,
15      you don't have to.  There was an indication in the record that he
        was injected with something.  Do you recall that?
16
                **INMATE JACKSON:**  I do recall that, I do recall it.
17
                **PRESIDING COMMISSIONER ORTEGA:**  Was he
18      injected with something?

19              **INMATE JACKSON:**  I don't know, I wasn't, I wasn't
        there.  I know during the course of the trial, he made mention of
20      that.  I wasn't there.

21              **PRESIDING COMMISSIONER ORTEGA:**  Okay, I
        wanted to mention that there was an indication of that which,
22      again, raises [sic] to the level of not telling what he was injected
        with.  It could very well have been something that could have
23      killed him.  So there's no way of knowing that.  Anyway, the
        previous record, the prisoner had a record of violence or assaultive
24      behavior and he had an escalating pattern of criminal conduct or
        violence.  He failed to profit from society's previous attempts to
25      correct his criminality.  Those attempts did include juvenile camp,
        CYA commitment, prior prison terms, juvenile probation, adult
26      probation.  His unstable social history and prior criminality

                                        14

1    included approximately six to seven pages of prior arrests.  Of
     significance are the convictions.  He had a conviction for robbery
2    as a youth and served a term in CYA.  He also had a conviction for
     burglary, for which he served a prison term prior to this
3    commitment offense.  And after committing this offense, he then
     had also, I believe it was afterwards, he had some robberies in
4    Santa Clara County for which he again went to trial and was
     convicted on those as well.  Institutionally, he, don't know what to
5    say here, you've done just about everything we could ask you to
     do.  The only problem that we have is that 115, and I'll go into
6    more into depth in that, but his misconduct while incarcerated has
     included fourteen 115s, and the most recent one was September the
7    19th, 1998.  That was for grooming standards.  In the area of 3042
     responses, the District Attorney's Office of Los Angeles is not
8    supportive, totally supportive of release at this particular time.
     Under remarks, again, it's difficult to say.  I just want to say that
9    we want to commend you for all the fine work that you've done,
     although you haven't completed a vocation, you have completed a
10   vocational, at least a paralegal, so you are a certified paralegal.
     And I think I saw kind of a, if you can call it a major in paralegal
11   and a minor in civil litigation.

12              **INMATE JACKSON:**  Yes.

13              **PRESIDING COMMISSIONER ORTEGA:**  It appears
     that that's where you focused much of your attention on that civil
14   litigation.

15              **INMATE JACKSON:**  Yes.

16              **PRESIDING COMMISSIONER ORTEGA:**  And you
     also had an outstanding grade in that area.  And also for your
17   positive work reports.  It seems like you have done very well since
     your last hearing, you've worked as a distribution clerk, also as an
18   academic clerk and, of course, as the (inaudible) clerk.

19              **INMATE JACKSON:**  Yes.

20              **PRESIDING COMMISSIONER ORTEGA:**  So you've
     done very well in those places.  This will be a one year denial.
21   And during the next 12 months, keep doing what you're doing.

22   (Id. at 47-50.)

23        The presiding commissioner then observed that petitioner is "truly an impressive

24   man" and continued:

25              You have done everything that we've asked.  I made the comment
                earlier to my fellow Commissioners that it seems that almost
26              without exception, when I look at somebody that has done his

                                      15

program as well as you have, the thing that normally really causes them the conflicts is that prior arrest record.  It seems that always they have real long arrest records and that is something we have to, of course, be mindful of.  In your case, I think you've overcome that.  The problem, of course, was that 115.  It wouldn't have taken me much to vote for a date, I can tell you that, and I think my fellow Commissioners would probably have felt much the same way.  But when you get the 115 and, quite frankly, I'm concerned, and I probably shouldn't worry about this, but I'm concerned what would happen once it left us.  I don't want to disappoint you.  I think with another year disciplinary-free behavior, and what I liked about your responses was that you admitted, yeah, I probably should have shaved and it would have saved me a lot of heartache.  Some come in here headstrong and say, no, not for any reason.  Well, the reality is, sometimes we got to do things we don't like to do.

   **INMATE JACKSON:**  Yes, I understand.

   **PRESIDING COMMISSIONER ORTEGA:**  And you owned up to that, I admire you for that.  You should be proud of your accomplishments and I think the time is very close for you.

(Id. at 50-51.)

   Commissioner Bordanaro concurred:

You're very close, coming down the home stretch.  That 115 definitely hurt you.  Get some clean time.  Don't take this as a disappointment.  The next Panel will see that.  You come back in a year and your parole plans are still real solid, come back with clean time, come back with a good attitude and hopefully it will have enough time between you and that 115 when the next Panel will see, see to it and give you a date.  But I think you're real close.

(Id. at 51-52.)  Commissioner Cater agreed and reiterated his appreciation of petitioner's "being

forthcoming."  (Id. at 52.)

   The Solano County Superior Court found that the Board's decision "was based

upon 'some evidence' other than the evidence of the 9/19/98 CDC 115 for violation of grooming

standards" and therefore declined to address "the question of whether the 9/19/98 CDC 115 was

constitutionally valid."  That court also found that the Board had based its decision on the criteria

contained in § 2281, a regulation properly adopted under the Administrative Procedures Act.  On

the basis of these findings, the court ruled that petitioner had not alleged facts sufficient to show

16

that the Board denied him a fair hearing.  (Supplemental Traverse, Ex. E.)  However, the Superior Court's order does not discuss, or even identify, any evidence relied upon by the Board other than that relating to the grooming standard violation.  Nor does the court's order address the reliability of the other evidence relied upon.

The Board commenced its decision by stating that the panel had reviewed "all the information received from the public" and had concluded that "the prisoner is not suitable for parole, that he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  (Answer, Ex. B at 47.)  The phrases "unreasonable risk of danger to society" and "a threat to public safety" are derived from § 3041(b) of the California Penal Code and § 2281(a) of Title 15 of the California Code of Regulations.  Pursuant to this statute,

> [t]he panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Penal Code § 3041(b).

The state regulation that governs parole suitability for life prisoners casts the statutory requirement of § 3041(b) in the negative:  "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."  Cal. Code Regs. tit. 15, § 2281(a).  The same regulation requires the Board to consider all relevant, reliable information available regarding

> the circumstances of the prisoner's: social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

17

1    Cal. Code Regs. tit. 15, § 2281(b).

2         The regulation identifies circumstances that tend to show suitability or

3    unsuitability for release.  Id., § 2281(c) & (d).  The following circumstances tend to show that a

4    prisoner is suitable for release:  the prisoner has no juvenile record of assaulting others or

5    committing crimes with a potential of personal harm to victims; the prisoner has experienced

6    reasonably stable relationships with others; the prisoner has performed acts that tend to indicate

7    the presence of remorse or has given indications that he understands the nature and magnitude of

8    his offense; the prisoner committed his crime as the result of significant stress in his life; the

9    prisoner's criminal behavior resulted from having been victimized by battered women syndrome;

10   the prisoner lacks a significant history of violent crime; the prisoner's present age reduces the

11   probability of recidivism; the prisoner has made realistic plans for release or has developed

12   marketable skills that can be put to use upon release; institutional activities indicate an enhanced

13   ability to function within the law upon release.  Id., § 2281(d).

14        The following circumstances tend to indicate unsuitability for release:  the

15   prisoner committed the offense in an especially heinous, atrocious, or cruel manner; the prisoner

16   had a previous record of violence; the prisoner has an unstable social history; the prisoner's

17   crime was a sadistic sexual offense; the prisoner had a lengthy history of severe mental problems

18   related to the offense; the prisoner has engaged in serious misconduct in prison.  Id., § 2281(c).

19   Factors to consider in deciding whether the prisoner's offense was committed in an especially

20   heinous, atrocious, or cruel manner include these:  multiple victims were attacked, injured, or

21   killed in the same or separate incidents; the offense was carried out in a dispassionate and

22   calculated manner, such as an execution-style murder; the victim was abused, defiled or

23   mutilated during or after the offense; the offense was carried out in a manner that demonstrated

24   an exceptionally callous disregard for human suffering; the motive for the crime is inexplicable

25   or very trivial in relation to the offense.  Cal. Code Regs., tit. 15, § 2281(c)(1)(A) - (E).  Under

26   current California law, the Board is apparently not required to refer to sentencing matrixes or

18

compare the prisoner's crime to other crimes of the same type in deciding whether the crime was especially cruel or exceptionally callous but may find the crime especially cruel or exceptionally callous if there was violence or viciousness beyond what was "minimally necessary" for a conviction.  In re Dannenberg, 34 Cal. 4th 1061, 1095 (2005).

In the present case, the Board indicated reliance on three circumstances in finding petitioner not suitable for parole on July 12, 2000:  (1) petitioner's commitment offense, (2) petitioner's criminal and social history, and (3) the CDC-115 issued to petitioner on September 19, 1998.  Because the state court declined to address the constitutionality of the CDC-115 and found that the Board's decision was supported by other evidence, the undersigned has carefully examined the record for reliable evidence concerning petitioner's commitment offense and his conduct prior to imprisonment.

Citing petitioner's commitment offense as "[t]he number one reason" for finding him not suitable for parole, the presiding commissioner stated that the offense was "carried out in a dispassionate and calculated manner" that "demonstrates an exceptionally callous disregard for human suffering."  (Answer, Ex. B at 47.)  In support of this characterization of the offense as one carried out in a dispassionate and calculated manner, the presiding commissioner merely recited the bare facts of the crime:  "the prisoner and his crime partners planned to kidnap the victim and to solicit 60 thousand dollars from his family and, as a result of that, the victim was kidnaped, taken to the apartment, which belonged to the inmate," and held there overnight before he succeeded in escaping.  (Id.)  In support of the characterization of the offense as demonstrating "an exceptionally callous disregard for human suffering," the presiding commissioner offered only speculation regarding "an indication in the record that [the victim] was injected with something." (Id.)  The injection issue was not raised during the hearing, and apparently that omission prompted the presiding commissioner to permit petitioner to respond. Petitioner, who was under oath, recalled the victim's trial testimony regarding an injection but testified that he "wasn't there." (Id. at 48.)  On the basis of that response, the presiding

19

1    commissioner appeared to abandon the belated attempt to find the offense exceptionally callous,

2    commenting that there was "no telling what [the victim] was injected with" and whether it was

3    "something that could have killed him."  (Id. at 47-48.)  The undersigned has examined the entire

4    discussion of petitioner's commitment offense during the hearing and finds no additional

5    evidence that supports the characterization of petitioner's offense as one that was carried out in a

6    dispassionate and calculated manner or a manner that demonstrates an exceptionally callous

7    disregard for human suffering.  (See id. at 8-15.)  The record also does not support a conclusion

8    that the offense was committed with violence or viciousness beyond what was minimally

9    necessary to convict petitioner of kidnaping.

10           The Board's second reason for finding petitioner unsuitable for parole was his

11   pre-conviction criminal record and an unstable social history.  The presiding commissioner cited

12   "a record of violence or assaultive behavior," "an escalating pattern of criminal conduct or

13   violence," failure to profit from attempts to correct criminality through juvenile probation,

14   juvenile camp, a CYA commitment, adult probation, and prior prison terms, "six to seven pages

15   of prior arrests," convictions for robbery and burglary, and an unstable social history.  (Id. at 48-

16   49.)  The Board's discussion of petitioner's criminal and social history during the pronouncement

17   of the decision and during the hearing itself was vague and conclusory.  (See id. at 11-22.)

18   Petitioner did not dispute that his prior arrest record was extensive, and he and his attorney

19   agreed to the incorporation of his arrest record into the proceeding, although the attorney

20   objected that mere arrests were irrelevant.  (Id. at 11-12).  The transcript of the hearing reveals no

21   details of the asserted record of violence or assaultive behavior, or the escalating pattern of

22   criminal conduct or violence.  It appears that petitioner's unstable social history commenced

23   when petitioner was 11 years old and his father died of cancer.  Petitioner stated that he was

24   devastated by his father's death and that he "took to the streets." (Id. at 19.)  When he was 23

25   years old, he committed the offense that resulted in his current incarceration.  (Id. at 16-19.)

26   However, petitioner married and had children prior to his incarceration.  (Id. at 17.)  Petitioner

20

1   maintained strong family ties with his mother, his siblings, and his children despite his

2   incarceration, and his parole plans in 2000 included residing with his mother upon release.  (Id. at

3   20-22, 29-30, 34.)  The record does not reflect any post-conviction record of violence or

4   instability.

5           The Board's third reason for denying parole was "misconduct while incarcerated."

6   The presiding commissioner cited fourteen rule violation reports received by petitioner over the

7   course of twenty years in state prison but discussed only the rule violation report issued on

8   September 19, 1998, related to grooming standards.  In connection with this reason for denying

9   parole, the presiding commissioner also noted that the District Attorney's Office of Los Angeles

10  County was not "totally supportive of release at this particular time."  (Id. at 49.)  During the

11  hearing, the Board had considered extensive post-conviction evidence, including the following:

12  petitioner's classification score was zero; in a November 1999 report, petitioner's correctional

13  counselor had written that petitioner had complied with the Board's previous recommendations

14  to remain disciplinary-free, upgrade vocationally, and participate in self-help and therapy groups

15  but believed petitioner posed a moderate degree of threat to the public if released from prison and

16  might benefit from continuing to participate in his religion and in self-help programs while

17  remaining disciplinary-free; in a psychological evaluation prepared for the hearing, Dr. Clair

18  stated that petitioner had no need for any kind of treatment, had no major disorders, had his

19  emotions and behaviors under tight control, had not actually caused physical injury to any other

20  person, including the victim of his commitment offense, and would not be dangerous in any way

21  if granted parole; petitioner received rule violation reports for conduct ranging from possession

22  of inmate manufactured alcohol and trafficking of narcotics to failure to report to job

23  assignments and resisting staff; petitioner received eighteen custodial counseling memos prior to

24  July 1996; petitioner received certification as a legal assistant in 1986 from California State

25  University, Long Beach; petitioner completed paralegal studies in 1994 with a certificate in civil

26  litigation; petitioner had solid parole plans for residence with his mother, a job as a consultant for

the African-American Business Association, continued practice of his religion, and volunteer work with youth; letters of support were submitted by petitioner's mother and two non-relatives. (Id. at 24-35.)

The Board did not discuss the details of petitioner's disciplinary history during the hearing or in the statement of decision.  Toward the end of the hearing, one of the commissioners asked petitioner a general question about the 1998 grooming violation, and petitioner responded that when the grooming standards were implemented he had been growing his beard since he became a Muslim.  He stated that he explained to the hearing officer that growing a beard is a requirement for Muslims and that the grooming standards were being litigated.  Petitioner told the Board there had been a settlement in the class action and CDC-115's issued concerning the grooming standards would be rescinded.  (Id. at 40-41.)  The presiding commissioner remarked that "the 115 still stands" and suggested that it would have been wiser for petitioner to do as requested.  (Id. at 41-42.)

The Los Angeles County District Attorney's Office asserted that petitioner had "not demonstrated he would not pose a risk to the community if he was released."  (Id. at 42.) The deputy district attorney cited petitioner's "record of noncompliance with departmental rules and regulations" and argued that continuing to re-offend in the institution showed that petitioner would re-offend if released in the community.  (Id. at 41-42.)  He urged the Board to require "a significant period of time in [petitioner's] record that demonstrates that he can avoid violating the rules and regulations."  (Id. at 42-43.)  However, the psychological evaluation by Dr. Clair places petitioner's noncompliance with rules and regulations in perspective.

> The inmate now regrets and repudiates his actions [at the time of his offense] together with the series of criminal behaviors that he was involved [in] during this part of his life.  He continued to behave rebelliously during his first years in prison, but underwent a sort of sea-change and maturation with his conversion to Islam in 1988.  He has always been a "feisty" person, a quality which has regularly brought him into conflict with correctional officers.

/////

1  (Pet., Ex. E at 3.)  Dr. Clair believed that petitioner would not be "in any sense 'dangerous'" if

2  granted parole.  (Id.)

3          With regard to petitioner's institutional behavior, the presiding commissioner

4  began by saying petitioner had "done just about everything we could ask you to do" and then

5  noted that "[t]he only problem that we have is that 115." (Answer, Ex. B at 49.)  The presiding

6  commissioner also commended petitioner "for all the fine work" he had done and for his

7  outstanding grades and positive work reports; he advised petitioner that the denial of a parole

8  date was a one-year denial and urged petitioner to "keep doing what you're doing."  (Id. at 49-

9  50.)  After describing petitioner as "truly an impressive man" who had "done everything that

10  we've asked" and who had "overcome" his arrest record and criminal history, the presiding

11  commissioner advised petitioner a second time that "[t]he problem, of course, was that 115." (Id.

12  at 50-51.)  He continued, "[i]t wouldn't have taken me much to vote for a date, I can tell you that,

13  and I think my fellow Commissioners would probably have felt much the same way." (Id. at 51.)

14  He then cited the 115 a third time and advised petitioner that he needed "another year

15  disciplinary-free behavior."  (Id.)  The presiding commissioner reiterated that petitioner should

16  be proud of his accomplishments and stated his belief that "the time is very close for you."  (Id.)

17          Commissioner Bordonaro concurred with the presiding commissioner, advising

18  petitioner that he was "very close, coming down the home stretch," but that "[t]hat 115 definitely

19  hurt you." (Id. at 51.)  He assured petitioner that another year would be "enough time between

20  you and that 115" for the next panel to give him a parole date.  (Id. at 51-52.)  Deputy

21  Commissioner Cater agreed.  (Id. at 52.)

22          The undersigned finds that the Board's decision to deny parole on July 12, 2000,

23  was grounded on petitioner's commitment offense, his pre-conviction record, and his 1998

24  disciplinary conviction for refusing to shave his beard.  Notably absent from the record is a

25  finding, either during the hearing or in the Board's statement of decision, that the refusal to shave

26  as a matter of religious conviction comprised "serious misconduct in prison" that tended to

1   indicate unsuitability for release.  See Cal. Code Regs. tit. 15, § 2281(c) (describing serious

2   misconduct in prison or jail as a circumstance that tends to indicate unsuitability for release).

3   Also absent is any showing that petitioner's refusal to comply with a grooming regulation on

4   religious grounds is reliable evidence indicating that he would pose an unreasonable risk of

5   danger to society or a threat to public safety if released.  As the Supreme Court has observed with

6   regard to parole decisions, "[t]he behavior record of an inmate during confinement is critical in

7   the sense that it reflects the degree to which the inmate is prepared to adjust to parole release."

8   Greenholtz, 442 U.S. at 15.  Here, there is no evidence that petitioner's commitment to his

9   religion demonstrates inability to adjust to parole release.

10         Aside from the 1998 disciplinary conviction, the Board denied parole solely on

11   the basis of petitioner's commitment offense and pre-conviction record.  While state law

12   authorizes the Board to determine that the gravity or timing of the prisoner's offense "requires a

13   more lengthy period of incarceration for this individual," the Board made no such determination

14   in the present case.  See Penal Code § 3041(b).  Moreover, the Board expressly found that

15   petitioner has overcome his prior record, and the record of proceedings before the Board does not

16   show that petitioner's offense was carried out in a dispassionate and calculated manner or in a

17   manner that demonstrated exceptionally callous disregard for human suffering.

18         Where a prisoner has demonstrated exemplary behavior and evidence of

19   rehabilitation over a period of time, as petitioner had done at the time of the hearing on July 12,

20   2000, denying him a parole date simply because of the nature of his offense and his prior conduct

21   raises serious questions involving his liberty interest in parole.  Biggs, 334 F.3d at 916 (affirming

22   the denial of habeas relief to a prisoner found not suitable for parole after serving only fourteen

23   years of a sentence of twenty-five years to life for participating in the murder of a witness who

24   was tricked into believing he was being taken out of state).  At the time of his eighth subsequent

25   parole consideration hearing, the petitioner in this case had served twenty years on a sentence of

26   seven years to life for a kidnaping that did not result in a death or any injury.  The record before

the Board contained substantial evidence of rehabilitation and exemplary behavior but for a

violation of a grooming rule that conflicted with petitioner's religion and which the state court

declined to address.[2]  The Board's continued reliance on the unchanging factors of petitioner's

commitment offense and conduct prior to his current imprisonment, in the face of a positive

psychological report and substantial evidence of remorse and rehabilitation, "runs contrary to the

rehabilitative goals espoused by the prison system" and constitutes a due process violation.  See

Biggs, 334 F.3d at 917.

The undersigned finds that the Board's decision to deny parole on July 12, 2000,

is not supported by any evidence bearing indicia of reliability.  The state court's decision was

based on an unreasonable determination of the facts in light of the evidence presented in the

parole hearing.  Petitioner is therefore entitled to federal habeas relief under the Due Process

Clause of the Fourteenth Amendment.  In the absence of any evidence in the record supporting

the Board's decision, remanding the case for a new hearing is futile, and the appropriate remedy

is to grant the release of the petitioner.  See McQuillion v. Duncan (McQuillion II), 342 F.3d

1012, 1015-16 (9th Cir. 2003).

B.  Petitioner's Second Ground for Relief

Petitioner contends that he was denied parole as a result of the Board's application

of policies, practices, and regulations not approved by the Office of Administrative Law.

Petitioner has offered evidence that, under state law, any policy or practice of denying parole to

all life prisoners is invalid because no such policy or practice has been adopted in accordance

with state law.  (Pet., Ex. D.)  Petitioner has also offered newspaper articles and other documents

---

[2]  In Mayweathers, et al. v. Terhune, et al., case No. CIV S-96-1582 LKK GGH P, the court granted plaintiffs' motion for permanent injunctive relief.  The California Department of Corrections is permanently enjoined from imposing any form of discipline on prisoners for wearing half-inch beards for religious purposes.  (Order filed June 25, 2004, at 23-27 & 34.)  All documents reflecting disciplinary action taken on or after November 19, 1998, against prisoners who wore such beards must be expunged from their custody files.  (Order filed Sept. 17, 2004, at 2.)  The docket for the Mayweathers case reflects that the final judgment is on appeal.

1   to show that invalid parole policies and practices existed under former governors Wilson and

2   Davis.  (Id., Ex. F.)

3           The parole denial at issue in this case occurred when Gray Davis was governor of

4   the state.  Petitioner's evidence demonstrates that this governor vetoed parole recommendations

5   for virtually every prisoner convicted of murder, with rare exceptions.  In an undated newspaper

6   article titled "Davis denies parole hopes to all killers," a spokesman for Davis is quoted as saying

7   the governor would be "hard-pressed to find any reason why someone who's committed murder,

8   even second-degree murder, should be paroled."  (Id., Ex. F at 6.)  The same spokesman

9   described the governor's actions as consistent with "his philosophy on murder sentences."  (Id.)

10  The article reports that Davis blocked release of five prisoners who killed their victims or

11  participated in crimes that resulted in murder.  (Id.)  An article dated April 9, 1999, titled "Davis

12  Takes Hard Line on Parole for Killers," reports that Davis had rejected the Board's unanimous

13  parole recommendations in all five second-degree murder cases sent to him for review and had

14  also sent three unanimous parole recommendations in kidnap and attempted murder cases back to

15  the Board for further review.  (Id., Ex. F at 7-9.)  Davis himself stated in an interview that all

16  murderers should serve a life sentence in prison.  (Id., Ex. F at 7.)  While some of the documents

17  submitted by petitioner speculate that Davis may have had a broader policy of denying parole to

18  all prisoners serving life terms, including prisoners convicted of kidnaping, petitioner has not

19  submitted evidence that proves the existence of such a policy or practice.  In fact, in a document

20  titled "Analysis of the 2000-01 Budget Bill, Board of Prison Terms (5440)," the Legislative

21  Analyst's Office reported that there was "[a]n unwritten administration policy that effectively

22  ensures that no inmate with a life sentence is released on parole has significant legal, policy, and

23  fiscal ramifications for the state criminal justice system" but was unable to determine "[w]hether

24  the administration's no-parole policy applies only to offenders convicted of murder or also

25  extends to other lifers."  (Id., Ex. F. at 14 & 17.)

26  /////

1   Petitioner has not established that in 2000 the governor had a no-parole policy for

2   prisoners serving life terms for crimes other than murder.  In addition, petitioner was not granted

3   a parole date, and the governor had no occasion to veto a parole date for petitioner.  Petitioner's

4   evidence does not establish that the Board of Prison Terms had a no-parole policy for all life

5   prisoners in 2000 or that the panel of three commissioners who conducted petitioner's hearing on

6   July 12, 2000, were applying a no-parole policy when they denied petitioner a parole date.

7   Accordingly, petitioner is not entitled to habeas relief on his second claim.

8       C.  Other Claims

9   The Fourteenth Amendment provides that  "[n]o State shall . . . deny to any

10  person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1.

11  The Equal Protection Clause requires the state to govern impartially.  McQueary v. Blodgett, 924

12  F.2d 829, 834 (9th Cir. 1991).  Laws and rules that apply evenhandedly to all persons within a

13  jurisdiction comply with the fundamental principle of equal protection.  See id. (citing Jones v.

14  Helms, 452 U.S. 412, 423 (1981)).  To establish an equal protection violation, a prisoner must

15  show that others similarly situated were treated more favorably and that the disparate treatment

16  was based on an impermissible motive.  See United States v. Estrada-Plata, 57 F.3d 757, 760 (9th

17  Cir. 1995).  Ultimately, the Equal Protection Clause "'guarantees equal laws, not equal results.'"

18  McQueary, 924 F.2d at 835 (quoting Personnel Adm'r v. Feeney, 442 U.S. 256, 273 (1979)).  A

19  petitioner raising an equal protection claim in the parole context must demonstrate that he was

20  treated differently from similarly situated prisoners and that the Board lacked a rational basis for

21  its decision.  See McGinnis v. Royster, 410 U.S. 263, 269-70 (1973).  The petitioner in this case

22  has not shown that similarly situated prisoners have been granted parole dates.  Therefore,

23  petitioner is not entitled to relief on his equal protection claim.

24  The First Amendment, made applicable to the states by the Fourteenth

25  Amendment, bars the state from making laws prohibiting the free exercise of religion.  U.S.

26  Const. amends. I and XIV § 1.  Under the Free Exercise Clause of the First Amendment,

27

prisoners must be afforded "a 'reasonable opportunity' to worship in accordance with their conscience." Johnson v. Moore, 948 F.2d 517, 520 (9th Cir. 1991) (per curiam). At the same time, a prisoner's First Amendment rights are "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." See McElyea v. Babbitt, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam). The petitioner in this case has not shown that the decision of the Board of Prison Terms on July 12, 2000, served to deny him a reasonable opportunity to worship in accordance with his conscience. Petitioner is not entitled to relief on his First Amendment claim.

Accordingly, IT IS HEREBY ORDERED that:

1. Petitioner's July 9, 2004 motion requesting judicial notice of court records is granted;

2. Petitioner's January 11, 2005 motion requesting judicial notice of court records is granted;

3. Petitioner's March 1, 2005 motion to expedite, for final judgment, and for judicial notice is granted with respect to judicial notice and is otherwise denied;

4. Petitioner's June 6, 2005 motion requesting that the court take judicial notice of court records and related issues is granted with respect to judicial notice and is otherwise denied; and

IT IS RECOMMENDED that:

1. Petitioner's application for a writ of habeas corpus be granted on due process grounds and denied on all other grounds; and

2. The Board of Prison Terms be ordered to calculate petitioner's release date immediately and release petitioner on parole, unless petitioner has been convicted of a serious disciplinary infraction of a violent nature since the filing of this action.

These findings and recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within

twenty days after being served with these findings and recommendations, any party may file and serve written objections with the court.  A document containing objections should be titled "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to objections shall be filed and served within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 28, 2005.

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:13
saif2664.157